# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

IN THE MATTER OF THE SEARCH OF
INFORMATION ASSOCIATED WITH
ALIX@TIGRISACADEMY.COM;
ADMIN@TIGRISACADEMY.COM;
REIMBURSE@TIGRISACADEMY.COM;
ALEXANDRAKBRYANT@GMAIL.COM;
and ALIX@USHISTORYABROAD.COM
THAT ARE STORED AT PREMISES
CONTROLLED BY GOOGLE, INC.

**Filed Under Seal**

## AFFIDAVIT IN SUPPORT OF
## APPLICATION FOR SEARCH WARRANT

I, Tyler J. Duffey, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application for a search warrant for information associated with the following email accounts "alix@tigrisacademy.com" (the "Alix Tigris account"), "admin@tigrisacademy.com" (the "Tigris Admin account"), "reimburse@tigrisacademy.com" (the "Reimburse Tigris account"), "alexandrakbryant@gmail.com" (the "Bryant Gmail account"), and "alix@ushistoryabroad.com" (the "Alix History account") (collectively, the "Subject Accounts") that are stored at premises controlled by Google, Inc. ("Google"), an email provider headquartered at 1600 Amphitheatre Parkway, Mountain View, California 94043. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under Rule 41 of the Federal Rules of Criminal Procedure to require Google to disclose to the government copies of the information (including the content of communications) further described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate

the items described in Section II of Attachment B, using the procedures described in Section III of Attachment B.

2.      I am a Special Agent with the Office of Investigations of the Office of Inspector General ("OIG") for the U.S. Department of State ("DOS" or "State Department"), and have been since January 2017. In my capacity as a Special Agent, I have personally conducted and participated in investigations of visa fraud, wire fraud, financial fraud schemes, false statements, and contract and grant fraud. I received training in conducting criminal investigations from the Federal Law Enforcement Training Center, including training on the Fourth Amendment and the search and seizure of electronic evidence. Prior to my employment as a Special Agent, I was an executive staff assistant for the Office of Investigations at DOS-OIG and the General Services Administration ("GSA") OIG for approximately three years. In that capacity, I provided administrative support for senior managers overseeing investigations of DOS and GSA programs, contracts, grants, and financial records. I hold a Master of Public Administration degree from George Mason University and a Bachelor of Science in Business from Indiana University. In my case work, I have reviewed emails for evidence of criminal activity. Based on my training and experience, I am familiar with the means and methods used in financial fraud investigations.

3.      This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses.

4.      Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of 18 U.S.C. § 286 (Conspiracy), 18 U.S.C. § 287 (False, Fictitious, Fraudulent claims), 18 U.S.C. § 1001 (False Statements), and 18 U.S.C. § 1343

2

(Wire Fraud) have been committed by Alexandra Bryant, Trent Bryant, and others, in regard to a program fraud scheme described below. There is also probable cause to search the Subject Accounts described in Attachment A for evidence, instrumentalities, and fruits of these crimes as further described in Attachment B.

5.     To date, my investigation has revealed that Alexandra Bryant, owner of a company known as Tigris Academy, creates false and fraudulent invoices for DOS employees stationed abroad to submit to the U.S. Government as reimbursement for homeschooling expenses on behalf of their minor children. DOS's Embassy Financial Management Offices ("FMO") then pay Tigris Academy, which charges the families a fee and reimburses the family the remaining amount. My investigation has revealed that Tigris Academy does not provide any direct educational services to children or families of DOS employees, and is thus improperly submitting false claims to the U.S. Government and profiting from those false and fraudulent claims.

## JURISDICTION

6.     This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711, 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

## PROBABLE CAUSE

### *Relevant Entities and Individuals*

7.     The Department of State is an agency of the United States Government, which manages the United States' relationships with foreign nations and performs other diplomatic functions. The Department of State conducts its foreign policy mission at hundreds of overseas

3

posts and employs thousands of personnel overseas. The Department of State's headquarters are located in Washington, D.C.

8.     Trent Bryant has been employed by the Department of State's Bureau of Diplomatic Security from in or about September 2010 to present. From in or about July 2014 through in or about July 2017, Trent Bryant was assigned as a security engineering officer at the U.S. Embassy in Rabat, Morocco. During that time and until on or about May 28, 2016, when they relocated to Utah, his wife, Alexandra Bryant, and their three dependent children resided in Rabat, Morocco. Trent Bryant is currently a systems integration and monitoring section chief in the Department of State's Bureau of Diplomatic Security, Office of Security Technology.

9.     Alexandra Bryant owns and operates U.S. History Abroad and Tigris Academy. U.S. History Abroad was organized in Wyoming on or about May 9, 2014 and dissolved on January 17, 2017. On or about October 13, 2016, Alexandra Bryant signed a Statement of Domestication in Utah for U.S. History Abroad. Tigris Academy was registered as an umbrella school by Alexandra Bryant through the Wyoming Secretary of State on or about March 10, 2015. U.S. History Abroad is listed as the applicant, and Alexandra Bryant's signature appears on the application with her title as owner.

10.     The applications submitted to the Wyoming Secretary of State and the Utah Department of Commerce for U.S. History Abroad and Tigris Academy list 1775 E. Sunrise Park Drive, Sandy, UT 84093 as the business/principal office address. Additionally, the address is listed on payment instruction documents submitted to DOS by Tigris Academy. According to real estate records, this address is a single family residence owned by K.L. Based on information in Trent Bryant's security clearance file, K.L. is Alexandra Bryant's father.

4

11.    U.S. History Abroad, according to information available on the U.S. History Abroad website, provides a series of online classes designed for children of Foreign Service employees in kindergarten through eighth grade that adheres to the standards of learning guidelines in the American school system.  U.S. History Abroad also provides supplemental American history education for dependent children of DOS employees posted overseas.

12.    Tigris Academy, according to information available on the Tigris Academy website, is a comprehensive education solution provider, providing direct instruction to students using a combination of online classes, correspondence courses, appropriate materials in the home, and private instruction.  The Tigris Academy website lists the Tigris Admin account under the Contact section.

### DOS Educational Allowance Program Background

13.    DOS personnel living at an overseas post are entitled to participate in the DOS Educational Allowance Program.  Title 5, United States Code, Section 5924(4) authorizes an education allowance to assist employees with the extraordinary and necessary expenses, not otherwise compensated for, incurred because of their service in a foreign area or foreign areas in providing adequate education for their dependents.

14.    DOS personnel with dependent children have a variety of options for educating their children while at posts overseas, which each carry different education allowance amounts adjusted for each post.  They can:  (1) send their children to a school at post (*e.g.*, the American school or international school), (2) send their children to a school away from post (*e.g.*, a boarding school in the U.S. or elsewhere), or (3) homeschool their children.

15.    The Department of State Standardized Regulations ("DSSR") Section 277.3b specifically excludes a family from receiving compensation for homeschooling their children

5

themselves. However, families can receive compensation for using a direct education service provider and other allowable expenses.

16. In order to receive benefits through the DOS Education Allowance Program, DOS employees who incur expenses related to their dependent children's education are required to submit invoices, receipts, or other proof of payment to the FMO at their post of assignment. The FMO then processes claims for payment after verifying the expenses are allowable per DSSR Section 270. Payments are either made directly to the vendor providing goods or services, or as a reimbursement to the DOS employee if they have paid the expense upfront. Employees are only eligible for payment and reimbursement of expenses incurred prior to submitting invoices.

17. DSSR Section 270 defines the specific allotment amounts and regulations for the DOS Education Allowance Program. In the event a family chooses to use a direct education service provider in lieu of the school at post to homeschool their children, DSSR Section 274.12 authorizes an allowance rate of up to:

   a. $4,100 each school year for supplementary instruction;

   b. $11,600 each school year for home study/private instruction in grades K-8;

   c. $20,100 each school year for home study/private instruction in grades 9-12; and

   d. $71,500 each school year for home study/private instruction education of a child
      with special needs (up to $89,000 for school away from post).

If the local schooling option is considered adequate, reimbursement is limited to the school at post rate if it is lower than the home study and private instruction rate. The DOS Office of Overseas Schools determines the adequacy of the schools at the overseas posts that are not U.S. Department of Defense schools. The DSSR Section 271 states that the major criterion of "adequacy" is whether

6

a child of normal ability, upon completion of a grade, or its equivalent, can enter the next higher grade in a public school in the U.S.

### *Summary of Investigation*

Tigris Academy's Submission of Educational Allowance Claims to DOS

18.     Based on my investigation to date, from in or about July 2015 through in or about September 2017, Tigris Academy received total payments of approximately $1,815,217.15 from DOS over the course of approximately 80 transactions. These transactions came after DOS personnel submitted Tigris Academy invoices submitted in support of claimed education expenses and tuition associated with their dependent child(ren)'s homeschool, special needs, or supplementary education.

19.     According to records obtained from Tigris Academy QuickBooks account records, between on or about May 26, 2015 and on or about February 12, 2018, Tigris Academy sent invoices to approximately 64 individual customers for a total of approximately $2,506,518.73. The Tigris Academy QuickBooks account records include the Bryant Gmail account and the Tigris Admin account listed as contact email addresses.

20.     Based on interviews of DOS personnel who are customers of Tigris Academy, their dependent children have not received any direct educational instruction from Tigris Academy personnel. Further, they stated that Tigris Academy reimburses them for expenses as they are incurred throughout the academic year. Tigris Academy holds DOS educational allowance funds for families in an account, which they use to reimburse families for expenses after they are incurred. Tigris Academy charges a fee for invoicing DOS for the education allowance and then reimbursing families. The Tigris Academy website lists a variety of online curriculums from other companies, which are not developed or sold directly by Tigris Academy or its personnel.

21.     On or about September 8, 2017, agents interviewed M.G., a Tigris Academy customer and spouse of DOS employee D.G. M.G. informed the agents that (1) she has never had an expense denied by Tigris Academy; (2) Tigris Academy does not require any justification beyond receipts for expenses; (3) Tigris Academy charges a lump sum fee per child up front for their part in processing reimbursement requests for education allowance funds they hold; and (4) she emails scanned copies of receipts to Alexandra Bryant. A Tigris Academy invoice dated on or about June 29, 2015, attention D.G., with the Alix Tigris account listed in header under the Tigris Academy logo was submitted to DOS for payment for "Tuition- 2nd grade" for a total of $10,515. In a review of Tigris Academy's QuickBooks account records, invoice 1002 broke the fees out with $2,500 for "Sales: tuition 2015-2016 2nd grade: Henry" and $8,015 for "curriculum funds held for reimbursement."

22.     According to M.G., in the past, Tigris Academy distributed the funds as expenses were incurred and did not create the curriculum that M.G. used. However, according to M.G., as of in or about September 2017, Tigris Academy now has a range of services they directly provide, but M.G. stated they had not used any of the services. M.G. has a spreadsheet that is shared with Tigris Academy to track expenses and running balances for her three children's education allowances.

23.     On or about September 20, 2017, M.G. sent an email to agents stating in part, "To follow up on your questions, I submitted our family's [Tigris Academy] invoice to the FMO prior to the beginning of the school year. The fee per child is $2,500. Our family's overall budget planning document, like the final invoice submitted to the FMO, contains costs broken down by student as well as subject."

8

24.     On or about December 9, 2015, Danielle Wood, former management officer for the U.S. Consulate Vancouver, sent an email to Robert Kingman, former director of DOS's Office of Allowances and other DOS personnel. In the email, Wood copied information from the Tigris Academy website FAQ page.   The email containing the copied Tigris Academy website information contains the following instructions for Tigris Academy customers to submit receipts to the Reimburse Tigris account: "Q- How do I get reimbursed for resources? A- It's easy.  Send your receipts to reimburse@tigrisacademy.com.  We will provide you with quick reimbursements via direct deposit for the purchases you make for your child's educational needs.  Reimbursements can take as little as 48 hours."  In a review of Tigris Academy's QuickBooks account records, agents found Tigris Academy invoices with two categories of expenses, "Sales: tuition" and "curriculum funds held for reimbursement."

25.     Based on an interview conducted of Wood on or about April 25, 2017, Wood indicated she saw a post in the Livelines Special Needs Yahoo Group written by Alexandra Bryant concerning Tigris Academy and its role in helping DOS personnel that were tired of education expenses being denied by DOS's Office of Medical Services and FMOs at post.  Wood responded to the post indicating her concerns about the manner in which Tigris Academy was doing business. Subsequently, on or about January 10, 2016, Alexandra Bryant sent Wood an email from the Alix Tigris Account, in part stating,

> Tigris Academy's current policy is to carry-over funds from year to year but this was because I did not want families or the USG to feel like Tigris Academy was unjustly taking money from them at the end of the year. I see that what I thought would be a positive solution is being construed to be contradictory to the DSSR. I just didn't want families to assume that THEY would get any remaining funds because I know that would NOT be allowed. What are your thoughts on returning unused funds back to Post? Is this a possibility? I suppose what I am asking is: Are you willing to brainstorm with me a little bit to come up a solution to ensure that there are not liability issues for families? Could you be paid for consulting?

9

> I believe that as parents, we should spend the majority of our time focusing on our children's requirements and less time on reading and learning the fine print, which as you stated, is often left up to interpretation. I believe Tigris Academy can help parents to achieve this.

On or about January 10, 2016, Wood responded indicating she could not consult for an outside group that would do business with the government.

26.     Despite a warning from Wood that Tigris Academy may not be complying with the DSSR, Tigris Academy continued to submit invoices for education allowance funds for future reimbursement to DOS employees as expenses were incurred.

27.     When agents interviewed J.S., a Tigris Academy customer and spouse of DOS employee D.S., on or about September 7, 2017, she indicated that (1) Tigris Academy acted in a similar role to the embassy FMO, only easier; and (2) Tigris Academy makes the reimbursement process simple and straight forward. On or about June 15, 2017, Alexandra Bryant emailed, from the Alix Tigris account, J.S. invoice 353 for a total of approximately $23,249.50 for her two children in grades four and seven and payment instructions. In a review of Tigris Academy's QuickBooks account records, agents found invoice 1086 to J.S. on or about June 15, 2017 for approximately $23,000. Invoice 1086 broke the fees out with $5,000 for "Sales: tuition" and $18,200 for "curriculum funds held for reimbursement." However, on or about June 14, 2017, Alexandra Bryant emailed J.S. from the Tigris Admin account, in part stating, "[Tigris Academy] does not hold the employee/parent's funds or claim them as an educational allowance for future disbursements or credit for future selection(s) of goods/services. I can assure you that the tuition money we receive from DOS for your child's education will not be used for reimbursements (no longer applicable) or for contributions to the Scholarship Fund." J.S. told the agents that: (1) she used Live Education! Waldorf Homeschool Curriculum as part of her children's education; (2) she

10

purchased the Live Education! Curriculum on her own and submitted the receipt to Tigris Academy for reimbursement; and (3) she purchased extra supplies and materials to supplement the Live Education! curriculum and submitted receipts to Tigris Academy for reimbursement from her children's education allowance funds held by Tigris Academy.

28.     When agents interviewed M.M., Tigris Academy customer and Spouse of DOS employee J.M., on or about September 8, 2017, M.M. indicated that (1) at the beginning of each academic year, she creates a budget for her children's educational and therapy expenses; (2) she sends the budget to Alexandra Bryant who approves or disapproves; (3) Alexandra Bryant then submits an invoice to M.M. by email with a single line item with the full budget amount, including Tigris Academy's fee; (4) M.M. or J.M. then submits the invoice to the DOS FMO at post who then either requests more documentation or approves and pays Tigris Academy directly; (5) as M.M.'s family incurs expenses they submit the receipts to Tigris Academy for reimbursement; and (6) Tigris Academy uses a Google document to track reimbursements and the education allowance balances, which is how M.M. knows the remaining balance she has available for reimbursements. In a previous year, M.M.'s family had five dollars remaining at the end of the academic year, but for academic year 2017, there were a few hundred dollars remaining. According to M.M., Tigris Academy does not return the funds to DOS or M.M.'s family, and the money cannot be rolled over to the next academic year. Tigris Academy's retention of DOS funds is a violation of the DOS Education Allowance Program.

29.     On or about September 29, 2017, K.B., Tigris Academy customer and spouse of DOS employee, emailed Tigris Academy invoice 386 and payment instructions to the FMO at post for a total of approximately $11,600. In the body of the email from K.B., Alexandra Bryant's signature block, including the Alix Tigris account address, is listed below the body of the email

11

sent to the FMO with the invoice attached for processing/payment. In a review of Tigris Academy's QuickBooks account records, agents reviewed invoice 386 addressed to K.B. on or about September 18, 2017 for approximately $11,600. Invoice 386 had two line items, "Sales: tuition" for $2,500 and "curriculum funds held for reimbursement" for $9,100. The Tigris Admin account is listed at the top of the invoices under the Tigris Academy logo.

30. On or about January 4, 2018, A.J., Tigris Academy customer and DOS employee, emailed Tigris Academy invoice 394 to the FMO at post for a total of approximately $13,020. In the chain of emails attached with A.J.'s email to the FMO, there is an email sent on or about November 20, 2017 from the Alix Tigris account to M.J., A.J.'s spouse. In a review of Tigris Academy's QuickBooks account records, agents reviewed invoice 1109 addressed to M.J. on or about August 19, 2017 for approximately $13,020. Invoice 1109 had two line items, "Sales: tuition" for $2,500 and "curriculum funds held for reimbursement" for $10,250. The Tigris Admin account is listed at the top of the invoices under the Tigris Academy logo.

## Tigris Academy's Submission of Claims for Educational Allowance to the Department of Defense

31. On or about November 17, 2017, an agent interviewed Erika McCoy, program manager for the DoDEA. In or about September 2016, three DoD families submitted Tigris Academy invoices to DoDEA for payment. According to an interview and information obtained from McCoy, DoDEA paid one of the invoices for approximately $53,800 in homeschool allowance.

32. After the initial payment to Tigris Academy, the DoDEA compliance team reviewed Tigris Academy's program and the services they provided. McCoy was involved in the review of Tigris Academy, spoke directly to Alexandra Bryant, and requested a more detailed

breakdown of the invoiced tuition expenses from Alexandra Bryant. The first invoice submitted by Tigris Academy was for the maximum allowable amount for each child under the DSSR and contained a single line item for each of the four children bringing the total to approximately $53,800. Tigris Academy's QuickBooks account records invoice 1051 broke the fees out with $10,000 for "Sales: tuition" and approximately $43,800 for "curriculum funds held for reimbursement."

33.    Subsequently, in or about November 2016, DoDEA denied requests from the other two DoD families to use Tigris Academy. DoDEA wrote a letter to each of the families informing them that the Tigris Academy invoices did not qualify for payment because ". . . Tigris Academy is acting as a third party conduit for the transfer of federal funds; we are unable to pay Tigris for that type of service." Also, the letter stated, "Given DoDEA's authority, the administrative fee that Tigris charges, which is for the convenience offered to families (i.e. customizing a plan) is not deemed as a necessary expense or an expense that would be free of charge to a student in a U.S. public school (or homeschool)."

34.    Family X, whom had an invoice denied by DoDEA, asked DoDEA to contact Tigris Academy to resolve the issue. In subsequent communications between Alexandra Bryant and DoDEA, Alexandra Bryant asked how Tigris Academy could change their invoice to comply with DoDEA policy. On or about October 12, 2016, Alexandra Bryant, from the Alix Tigris account, emailed the DoDEA invoicing team a breakdown of school year 2016-2017 fees as follows: "Admin Fee K-8  $2500, Admin Fee 9-12 $4,000, Books $500, Supplies $250, Transcripts $250, Tuition K-8 $8,000, Tuition 9-12 $14,300." DoDEA told Alexandra Bryant that they can only reimburse after services and materials are purchased and cannot make payments in advance for items that have not yet been procured. DoDEA emailed Alexandra Bryant indicating that Tigris

13

Academy was not a direct education service provider, that invoices must be broken down by each line item, and that administrative fees are not allowed.

35.     On or about November 3, 2016, Alexandra Bryant sent an email from the Alix Tigris account to DoDEA following a phone call with McCoy and Kathleen Facon, DoDEA chief of educational partnerships and resources.  Alexandra Bryant wrote, "Tigris Academy is a direct provider of educational instruction and materials.  We can purchase curriculum on behalf of our students at discounted prices due to volume or wholesale rates. Tigris Academy is also a direct provider of education instruction to our students from our certified teachers, tutors, and advisors." DoDEA found this to be a contradiction of the information provided on the Tigris Academy website.

36.     In October 2016, a DoDEA analyst noted that he had "pulled up the website and noted that the school itself doesn't deliver a curriculum, rather it allows prospective parents to choose existing homeschool/virtual school projects and then submit receipts to Tigris for reimbursement."

37.     In a review of a Tigris Academy Zions Bank account, agents found additional payments made by Defense Finance and Accounting Services ("DFAS") on or about August and September 2017. The additional payments total approximately $98,199.80.

Non-Allowable Homeschooling Expenses Submitted by Alexandra Bryant to DOS

38.     On or about September 4, 2014, Trent Bryant submitted a memo to Embassy Rabat FMO, with the subject "Bryant Family Home School." In the memo, Trent Bryant stated, "This memo is to inform Rabat FMO that Trent J. Bryant and his spouse Alexandra K. Bryant will be home schooling for the 2014-2015 school year. We have three children however only two children qualify for the home schooling allowance due to age, J.B. and I.B."

14

39.     On or about January 27, 2015, Alexandra Bryant emailed, from the Alix History account, an invoice from Zaina Learning Center to the Embassy Rabat FMO for expenses related to her children's education.

40.     From in or about September 2015 through in or about May 2016, Alexandra Bryant emailed, from the Alix History account, Tigris Academy invoices for her three children's kindergarten, second, and third grade tuition.

41.     Though DSSR 277.3b specifically excludes compensation to parents for the childcare of their own children, from in or about September 2015 through in or about May 2016, Alexandra Bryant, the owner/operator of Tigris Academy, submitted Tigris Academy invoices with her signature for her children's tuition to the Embassy Rabat FMO for reimbursement. *See* DSSR 277.3 b. (stating non-allowable expenses lists "any form of compensation to the parents: nanny, childcare, or supervisory costs").

42.     Two of the invoices included the Tigris Admin account listed in the header under the Tigris Academy logo.  Alexandra Bryant sent the invoices to the Embassy Rabat FMO from the Alix History account on behalf of the Bryant Gmail account.  Alexandra Bryant submitted invoice 1009 on or about August 4, 2015 and invoice 1010 on or about September 3, 2015 to the Embassy Rabat financial management office.

43.     The invoices were processed by the Embassy Rabat FMO and direct deposit payments were made to Alexandra and Trent Bryant's Mountain America Credit Union account. Two of their children received the standard kindergarten through eighth grade education allowance and the other child received the special needs education allowance.  In total, Alexandra Bryant and Trent Bryant received payments for approximately $70,000 for invoices from Tigris Academy for homeschool expenses between in or about September 2015 through in or about May 2016.

44.     Based on a review of the audit history records obtained from Intuit, Inc. of Tigris Academy's QuickBooks account, there were two audit history transactions for deleted invoices, number 1009 and 1010, created on or about August 4, 2015 for $5,500 and August 9, 2015 for $6,180, respectively. The Bryant Gmail account is listed as the email address in the QuickBooks audit history record.

45.     On or about May 16, 2017, the DOS's Bureau of the Comptroller and Global Financial Services sent a DOS wide notice to all Financial Management Officers and Management Officers with the subject, "Educational Allowance Home Study Payment Guidance." The notice states,

> Home study/private instruction is either paid directly to a vendor or school for a recognized home study course (so long as the provider meets the requirements outlined in sub-point ii (a) below) or as a reimbursement to the employee. Payments may not be made to any officer or educational service provider without an itemized receipt showing all items and services purchased. In the case of home schooling, it is important that the individual course selections are listed.

Sub-point ii (a) states,

> A third party service provider may enroll a child with an educational provider on behalf of the parent. However, any disbursement of payment directly to the third party service provider or as a reimbursement to the officer must comply with existing law and regulations. The following documentation would be required (and additional information might be necessary): (a) Receipt(s) showing that the third party has already paid the educational provider their fees in advance of disbursement by the FMO. Third party service providers may not receive an advance payment as they are not the direct educational service provider.

Further, sub-point ii(e) details that, on invoices from third party service providers, "any servicing/umbrella fees must be itemized separately and are the personal responsibility of the officer [DOS Employee]." Finally, sub-point iii states, "All home school expenses must be turned into the Financial Management Office. Direct educational providers or third party service

16

providers are not permitted to hold any funds claimed as an educational allowance for future disbursement directly by them to the officer or credited for future selection(s) of goods/services."

46.     After the notice was sent, Alexandra Bryant obtained a copy from an unknown source and began submitting an annotated version indicating, at least in words, how Tigris Academy qualified as a direct educational provider despite evidence to the contrary.

### *Summary of Probable Cause*

47.     Throughout the scheme, Alexandra Bryant and others corresponded via email, including Danielle Wood, former management officer for the Consulate Vancouver FMO; Katharine Meredith, Special Assistant to the Comptroller, Bureau of the Comptroller and Global Financial Services; Paul McVicker, Director Bureau of the Comptroller and Global Financial Services, Office of Oversight, Management, and Analysis;  Newman Waters, Embassy Rabat FMO; Trishita Maula, Embassy Zagreb FMO; J.S., Tigris Academy customer; and Erika McCoy, Program Manager. DoDEA have voluntarily provided a number of emails involving the Subject Accounts to agents, including an email as recent as November 20, 2017. As demonstrated above, my review of those emails revealed that Alexandra Bryant communicated about the scheme with others from the Subject Accounts.

48.     In the course of the investigation the Subject Accounts have been used in the specific instances summarized below:

　　　　a. The Alix Tigris is listed in the header under the Tigris Academy logo on an invoice submitted to the attention of D.G. on or about June 29, 2015. On or about January 10, 2016, Alexandra Bryant used the Alix Tigris account to email U.S. Consulate General Vancouver former FMO management officer, Danielle Wood. On or about October 12, 2016 and November 3, 2016, Alexandra Bryant sent emails to DoDEA

from the Alix Tigris account. On or about June 15, 2017 and on or about November 20, 2017, Alexandra Bryant used the Alix Tigris account to send emails to Tigris Academy customers, J.S. and M.J. This suggests that the Alix Tigris account is used to communicate both with customers and with government agencies in regard to false and fraudulent claims.

b. The Tigris Admin account is listed on the Tigris Academy Website under the Contact section. The Tigris Admin account is listed as a contact email for the Tigris Academy QuickBooks account. The Tigris Admin account is under the Tigris Academy logo on invoices Alexandra Bryant submitted on or about August 4, 2015 and on or about September 3, 2015 to the U.S. Embassy Rabat, Morocco FMO for her children's education expenses. Alexandra Bryant emailed J.S. from the Tigris Admin account on or about June 14, 2017. The Tigris Admin account is listed under the Tigris Academy logo on invoices submitted on or about August 19, 2017 and on or about September 18, 2017 found in Tigris Academy's QuickBooks records. This suggests that the Tigris Admin account is used to communicate both with customers and with government agencies in regard to false and fraudulent claims.

c. The Reimburse Tigris account was listed in an email sent by Danielle Wood on or about December 9, 2015 to Robert Kingman, former director of DOS's Office of Allowances, and other DOS personnel with information copied from the Tigris Academy website, which lists instructions on submitting receipts for reimbursement. Furthermore, since Tigris Academy instructs individuals to submit

expense requests to the Reimburse Tigris account, it follows that evidence of additional false claims would be found in this account.

d. The Bryant Gmail account is listed as a contact email for the Tigris Academy QuickBooks account. The Bryant Gmail account was included in two audit history records for deleted invoices number 1009 and 1010, which were created on or about August 4, 2015 and on or about August 9, 2016 respectively. Alexandra Bryant sent invoices 1009 and 1010 on or about August 4, 2015 and on or about September 3, 2015 respectively to the U.S. Embassy Rabat, Morocco FMO from the Alix History account on behalf of the Bryant Gmail account.

e. Alexandra Bryant sent invoices 1009 and 1010 on or about August 4, 2015 and September 3, 2015 respectively to the U.S. Embassy Rabat, Morocco FMO from the Alix History account on behalf of the Bryant Gmail account. On or about January 27, 2015, Alexandra Bryant sent an email from the Alix History account with an invoice from the Zaina Learning Center to the U.S. Embassy Rabat, Morocco FMO for expenses related to her children's education. Alexandra Bryant sent emails from the Alix History Account from in or about September 2015 through in or about May 2016 with Tigris Academy invoices attached for her three children's kindergarten, second, and third grade tuition to the U.S. Embassy Rabat, Morocco FMO.

49.    On December 13, 2017 and March 13, 2018, agents issued a preservation letter to Google for the Subject Accounts, and it is currently in effect until June 13, 2018. In general, an email that is sent to a Google subscriber is stored in the subscriber's "mail box" on Google's servers until the subscriber deletes the email. If the subscriber does not delete the message, the

message can remain on Google's servers indefinitely. Even if the subscriber deletes the email, it may continue to be available on Google's servers for a certain period of time.

## BACKGROUND CONCERNING E-MAIL

50.    In my training and experience, I have learned that Google provides a variety of on-line services, including electronic mail ("email") access, to the public.  These email providers allow subscribers to obtain e-mail accounts at the domain names "gmail.com" or a created business domain name such as "tigrisacademy.com" or "ushistoryabroad.com" like the email accounts alix@ushistoryabroad.com or alix@tigrisacademy.com.   Subscribers obtain an account by registering with Google.  During the registration process, these service providers ask subscribers to provide basic personal information.  Therefore, the computers of Google likely to contain stored electronic communications (including retrieved and unretrieved email for the subscriber) and information concerning subscribers and their use of Google services, such as account access information, email transaction information, and account application information.  In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

51.    Google subscribers can also store with the provider files in addition to e-mails, such as address books, contact or buddy lists, calendar data, pictures (other than ones attached to emails), and other files, on servers maintained and/or owned by Google and Microsoft.  In my training and experience, evidence of who was using an email account may be found in address books, contact or buddy lists, emails in the account, and attachments to emails, including pictures and files.

52.    In my training and experience, email providers generally ask their subscribers to provide certain personal identifying information when registering for an e-mail account.  Such

information can include the subscriber's full name, physical address, telephone numbers and other identifiers, alternative e-mail addresses, and, for paying subscribers, means and source of payment (including any credit or bank account number). In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users. Based on my training and experience, I know that even if subscribers insert false information to conceal their identity, I know that this information often nevertheless provides clues to their identity, location, or illicit activities.

53.     In my training and experience, email providers typically retain certain transactional information about the creation and use of each account on their systems. This information can include the date on which the account was created, the length of service, records of log-in (*i.e.*, session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via the provider's website), and other log files that reflect usage of the account. In addition, email providers often have records of the Internet Protocol address ("IP address") used to register the account and the IP addresses associated with particular logins to the account. Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the email account.

54.     In my training and experience, in some cases, e-mail account users will communicate directly with an email service provider about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users. Email providers typically retain records about such communications, including records of contacts between the user and the provider's support services, as well records of any actions taken by the provider or user as a result

21

of the communications In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

55.     As explained herein, information stored in connection with an email account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each offense-element, or, alternatively, to exclude the innocent from further suspicion. From my training and experience, I know that the information stored in connection with an email account can indicate who has used or controlled the account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.    For example, email communications, contacts lists, and images sent (and the data associated with the foregoing, such as date and time) may indicate who used or controlled the account at a relevant time. Further, information maintained by the email provider can show how and when the account was accessed or used. For example, email providers typically log the IP addresses from which users access the email account along with the time and date. By determining the physical location associated with the logged IP addresses, special agents can understand the chronological and geographic context of the email account access and use relating to the criminal activity under investigation. This geographic and timeline information may tend to either inculpate or exculpate the account owner. Additionally, information stored at the user's account may further indicate the geographic location of the account user at a particular time (*e.g.*, location information integrated into an image or video sent via email). Finally, stored electronic data may provide relevant insight into the email account owner's state of mind as it relates to the offense under investigation. For example, information in the email account may indicate the owner's motive and intent to commit a crime (*e.g.*,

22

communications relating to the crime), or consciousness of guilt (*e.g.*, deleting communications in an effort to conceal them from law enforcement).

## CONCLUSION

56.     Based on the foregoing, I submit that there is probable cause to believe that the Subject Accounts contain fruits, instrumentalities, and evidence of this scheme. Therefore, I respectfully request that the Court issue the proposed search warrant.

57.     Because the warrant will be served on Google, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

## REQUEST FOR SEALING

58.     I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed for a period of 120 days, until October 12, 2018. These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may give targets an opportunity to flee/continue flight from prosecution, destroy or tamper with evidence, change patterns of behavior, notify confederates, or otherwise seriously jeopardize the investigation.

Respectfully submitted,


Tyler X Duffey
Special Agent
US Department of State
Office of the Inspector General

23

Subscribed and sworn to before me on this      __ day of _____      2018.


_____
HONORABLE ROBIN M. MERIWEATHER
UNITED STATES MAGISTRATE JUDGE

**ATTACHMENT A**
**Property to Be Searched**

This warrant applies to information associated with 1) alix@tigrisacademy.com; 2) reimburse@tigrisacademy.com; 3) admin@tigrisacademy.com; 4) alix@ushistoryabroad.com; and 5) alexandrakbryant@gmail.com that is stored at premises owned, maintained, controlled, or operated by Google, Inc., a company headquartered at 1600 Amphitheatre Parkway, Mountain View, CA 94043.

**ATTACHMENT B**

**Particular Things to be Seized and Procedures
to Facilitate Execution of the Warrant**

**I.      Information to be disclosed by Google, Inc. (the "Provider") to facilitate
execution of the warrant**

To the extent that the information described in Attachment A is within the possession,

custody, or control of the Provider, including any emails, records, files, logs, or information that

has been deleted but is still available to the Provider, or have been preserved pursuant to a request

made under 18 U.S.C. § 2703(f) on December 13, 2017 and March 13, 2018.  The Provider is

required to disclose the following information to the government for the account or identifier listed

in Attachment A:

a.      The contents of all emails associated with the account from July 2, 2015 to the

present, including stored or preserved copies of e-mails sent to and from the accounts, email

attachments, draft emails, the source and destination addresses associated with each email, the date

and time at which each email was sent, and the size and length of each email;

b.      All records or other information regarding the identification of the account, to

include full name, physical address, telephone numbers and other identifiers, records of session

times and durations, the date on which the account was created, the length of service, the IP address

used to register the account, log-in IP addresses associated with session times and dates, account

status, alternative e-mail addresses provided during registration, methods of connecting, log files,

and means and source of payment (including any credit or bank account number);

c.      The types of service utilized;

d.    All records or other information stored from July 2, 2015 to the present by an individual using the account, including address books, contact and buddy lists, calendar data, pictures, and files;

e.    All records pertaining to communications between the Provider and any person regarding the account, including contacts with support services and records of actions taken; and

f.    For all information required to be disclosed pursuant to this warrant, the physical location or locations where the information is stored.

The Provider is hereby ordered to disclose the above information to the government within fourteen days of the issuance of this warrant.

2

**II.     Information to be seized by the government**

All information described above in Section I that constitutes fruits, contraband, evidence and instrumentalities of violations of 18 U.S.C. § 286 (Conspiracy); 18 U.S.C. § 287 (False, Fictitious, Fraudulent claims); 18 U.S.C. § 1001 (False Statements); and 18 U.S.C. § 1343 (Wire Fraud), those violations occurring after July 1, 2015 through present, including, for each account or identifier listed on Attachment A, information pertaining to the following matters:

(a) False statements made to the Department of State (the "DOS");

(b) False, fictitious, or fraudulent claims submitted to the DOS;

(c) Communications, documents, attachments involving DOS personnel who use U.S. History Abroad and/or Tigris Academy to receive education allowance funds from the DOS;

(d) Attachments, receipts, and invoices related to the DOS education allowance payments submitted to or sent by representative(s) of U.S. History Abroad and/or Tigris Academy;

(e) Communications with any other individuals involved in the furtherance of the scheme(s);

(f) Evidence indicating how and when the email accounts were accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crime under investigation and to the email account owner(s);

(g) The identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s);

(h) Identification of coconspirators, accomplices, and aiders and abettors in the commission of the above offenses;

3

(i) Records relating to who created, used, or communicated with the account or identifier, including records about their identities and whereabouts;

(j) Wire transfer information, including, but no limited to account and wiring instructions and other information;

(k) Information related to preparatory steps taken in furtherance of the scheme(s);

(l) Information related to any criminal proceeds, including the disposition of such proceeds, resulting from the fraud scheme(s);

(m) Information that could lead to the identification of bank accounts or other financial accounts;

(n) Evidence related to attempts to conceal the scheme and conspiracy; and

(o) Evidence indicating the email account owner's state of mind as it relates to the crimes under investigation.

4

### III. Special Instruction Regarding Review of the Seized Material

With respect to law enforcement's review of the seized material identified in Attachment B, law enforcement (*i.e.*, the federal agents and prosecutors working on this investigation and prosecution), along with other government officials and contractors whom law enforcement deems necessary to assist in the review of the seized material (collectively, the "Review Team") are hereby authorized to review, in the first instance, the seized material.

If, during the review of the seized material, the Review Team finds potentially privileged materials, the Review Team will: (1) immediately cease its review of the potentially privileged materials at issue; (2) segregate the potentially privileged materials at issue; and (3) take appropriate steps to safeguard the potentially privileged materials at issue.

Nothing in this Instruction shall be construed to require the Review Team to cease or suspend review of all the seized material upon discovery of the existence of potentially privileged materials within a portion of the seized material.

5